THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

KATHY BLAGG                                                         PLAINTIFF

v.                        Case No. 4:19-cv-00049-KGB

EATON CORPORATION and EATON HEALTH AND
WELFARE ADMINISTRATIVE COMMITTEE                   DEFENDANTS

## OPINION AND ORDER

Plaintiff Kathy Blagg brings this action against defendants Eaton Corporation and the Eaton Health and Welfare Administrative Committee (collectively, "Eaton") to recover long-term disability benefits allegedly owed to her under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (Dkt. No. 1). Before the Court are Ms. Blagg's motion for judgment on the record and Eaton's motion for summary judgment (Dkt. Nos. 16, 17). For the reasons set forth herein, the Court denies Ms. Blagg's motion for judgment on the record and grants Eaton's motion for summary judgment.

### I.    Factual And Procedural History

The relevant factual and procedural history is as follows.

### A.    The Plan And Ms. Blagg's Claims For Disability Benefits

Ms. Blagg was employed by Eaton as a Manufacturing Assembly Technician at the Eaton facility in Searcy, Arkansas, from 1992 to November 10, 2015 (A.R. 269, 282).[1] While employed

---

[1] The Stipulated Administrative Record was filed electronically with the Court on April 29, 2019, and is bates-numbered "Administrative Record_000001–001057" (Dkt. No. 10). The Joint Amendment to the Stipulated Administrative Record was filed electronically with the Court on May 15, 2019, and is bates-numbered "Administrative Record_001058–001077" (Dkt. No. 14). For the sake of brevity, the Court will abbreviate the Administrative Record as "A.R."

by Eaton, Ms. Blagg participated in the "Eaton Corporation Disability Plan for U.S. Employees" ("the Plan"), with an effective date of January 1, 2002 (A.R. 1060).

Among other things, the Plan provides for monthly long-term disability benefits to be paid when an insured is sick or injured and cannot work for an extended period of time (A.R. 137–70). Specifically, the Plan explains that an insured will be considered disabled if, during the first 23 months, including 6 months of short-term disability, she is "[t]otally and continuously unable to perform the essential duties of [her] regular position or any suitable alternative position with the Company." (A.R. 139). On the 24th month of her disability, an insured is considered disabled if she is "[t]otally and continuously unable to engage in any occupation or perform any work for compensation or profit for which [she is], or may become, reasonably well fit by reason of education, training or experience – at Eaton or elsewhere." (A.R. 139). Additionally, the Plan states that:

> Objective findings of a disability are necessary to substantiate the period of time your health care practitioner indicates you are disabled. Objective findings are those that can be observed by your health care practitioner through objective means, not from your description of the symptoms. Objective findings include:
>
> - Physical examination findings (functional impairments/capacity);
> - Diagnostic test results/imaging studies;
> - Diagnoses;
> - X-ray results;
> - Observation of anatomical, physiological or psychological abnormalities; and
> - Medications and/or treatment plan.

(A.R. 145).

Eaton has delegated its fiduciary authority under the Plan to its Plan Administrator, the Eaton Health and Welfare Administrative Committee ("the Committee"), and its Claims Administrator, Sedgwick Claims Management Services, Inc. ("Sedgwick") (A.R. 161–62). On April 9, 2014, Ms. Blagg was approved for disability benefits under the "Eaton Corporation Short

Term Disability Plan." (A.R. 269). On October 8, 2014, Ms. Blagg transitioned onto the "Eaton Corporation Long Term Disability Plan." (A.R. 269). Sedgwick notified Ms. Blagg, by letter dated August 4, 2016, that it was terminating her long-term disability benefits under the "any occupation" standard of disability (A.R. 269). Ms. Blagg filed a first-level appeal of Sedgwick's decision on February 1, 2016 (*Id.*). The appeal was denied on March 31, 2017 (A.R. 270). On August 25, 2016, Ms. Blagg filed a second-level appeal with the Committee, which was denied on February 1, 2018 (A.R. 269–80). Ms. Blagg then commenced this action on January 23, 2019 (Dkt. No. 1).

### B.      Ms. Blagg's Relevant Medical History

On May 30, 2013, Ms. Blagg met for an initial consultation with Justin O. Franz, M.D., a board-certified orthopedic surgeon, and complained of bilateral hip pain (A.R. 665). Upon examination, Dr. Franz found that Ms. Blagg had full flexion and extension of bilateral hips without any pain and full range of motion with 90 degrees flexion and internal and external rotation of the hip, without pain. (A.R. 666). X-rays of Ms. Blagg's bilateral hips showed normal findings (*Id.*). Dr. Franz documented that Ms. Blagg had bilateral posterior buttock pain, likely related to lumbosacral symptoms (*Id.*).

A magnetic resonance imaging ("MRI") scan of Ms. Blagg's lumbar spine, dated June 20, 2013, showed: (1) mild degenerative changes in the lumbosacral spine which involve the facet joints and ligamentum flavum hypertrophy, particularly seen in the lower lumbar region, but with no evidence of canal or foraminal narrowing; and (2) an arachnoid cyst at the S2 level expanding the canal and causing scalloping of the posterior margin of the vertebra (A.R. 701).

On December 17, 2013, Ms. Blagg met with Gregory F. Ricca, M.D., a board-certified neurosurgeon, and complained of right hip and right lower extremity pain, as well as "stiffness" in

3

her lower back (A.R. 651). Ms. Blagg reported that she was "active lifting, climbing and crawling" and that she put up a Christmas tree, which caused pain and stiffness in her lower back and lower extremities (*Id.*). Dr. Ricca's physical examination was largely normal, except for pain in the area of the right greater trochanter (A.R. 653).

On April 9, 2014, Bruce K. Berkheimer, M.D., a board-certified podiatrist, diagnosed Ms. Blagg with plantar fasciitis and bunions and recommended surgery (A.R. 695). An MRI scan of Ms. Blagg's right ankle, dated June 4, 2014, revealed medial band plantar fasciitis with reactive marrow edema surrounding a calcaneal osteophyte but without intrinsic tendon or ligament abnormalities of the ankle demonstrated (A.R. 852).

On September 23, 2014, Jesse Burks, D.P.M., a board-certified orthopedic surgeon, diagnosed Ms. Blagg with bone contusion, right heel, resolving (A.R. 755). Dr. Burks' physical examination was largely normal, except for pain on palpation to the plantar and medial aspect of the right heel with mild edema and antalgic gait (*Id.*). Ms. Blagg returned to Dr. Burks for a follow-up visit on November 24, 2014 (A.R. 754). Dr. Burks' physical examination was negative, except for notable edema of the right heel, antalgic gait, and pain with medial and lateral compression (*Id.*). Dr. Burks diagnosed Ms. Blagg with a healing contusion on her right heel (*Id.*). X-rays of the right foot revealed increased sclerosis of the posterior plantar right calcaneus which is indicative of healing of the area (*Id.*). Dr. Burks opined that Ms. Blagg "should safely be able to return to work at the first of the year." (*Id.*).

On November 7, 2014, Ms. Blagg visited David M. Johnson, M.D., her primary care physician, who assessed her with acute sinusitis, essential hypertension, and bronchitis (A.R. 813). Ms. Blagg's review of systems and physical examination were normal (A.R. 810–12). Ms. Blagg returned to Dr. Johnson on December 17, 2014 (A.R. 805–09). Again, Ms. Blagg's review of

4

systems and physical examination were normal (A.R. 806–07).  Dr. Johnson assessed Ms. Blagg with essential hypertension, fatigue, lumbosacral disc degeneration, and arthralgia of the knee, patella, tibia, and fibula (A.R. 808).  Dr. Johnson also provided the following impressions:  low back pain with right radiculopathy, (2) weight gain, (3) fatigue, (4) joint pain, and (5) hypertension (*Id.*).

On December 29, 2014, Ms. Blagg met with Ronald D. Hardin, M.D., a board-certified gastroenterologist, to be evaluated for right-sided abdominal pain  (A.R. 713–16).  Ms. Blagg's physical examination was normal, and she was assessed with right-sided abdominal pain, present for several months and progressively worsening, gastroesophageal reflux disease-like symptoms, back pain involving right foot and right leg apparently with protruding disc, and chronic stress (A.R. 715–16).

On January 22, 2015, Ms. Blagg met for an initial consultation with Brad. A. Thomas, M.D., a board-certified spine surgeon, and complained of pain in her lower back, right hip, and right foot, which she rated a "10" on a scale of 1 to 10 (A.R. 734).  She described the pain as "sharp, deep, superficial, burning, and electric shock like," and explained that it "is constant" and "worse with any activity."  (*Id.*).  Review of systems was positive for weakness, lethargy, problems sleeping, weight gain, depression, dizzy spells, frequent headaches, eyesight worsening, ringing in the ears, stomach pains, heartburn, indigestion, changes in bowel habits, palpitations, chest pain, dizziness with standing, numbness, tingling, frequent voiding and urination, sexual problems, bone pain, pain/swollen joints, aching muscles, leg cramps after walking, and extremity weakness (A.R. 735).  X-rays of Ms. Blagg's lumbar spine did not show any fractures or instability (*Id.*).  Dr. Thomas explained that, although an MRI scan of Ms. Blagg's lumbar spine, dated January 8, 2015, showed an S2 arachnoid cyst, this was not the cause of her pain (A.R. 735, 747–48).  In Dr.

5

Thomas' opinion, the MRI scan did not show any significant impingement, "just some very mild degenerative disc change." (A.R. 735). Believing that "this is more of a hip problem than a back problem," Dr. Thomas referred Ms. Blagg to William Hefley, a board-certified orthopedic surgeon, who diagnosed her with trochanteric bursitis and gave her a steroid injection in the right hip (A.R. 735, 800). She began physical therapy the next month (A.R. 800).

Ms. Blagg returned to Dr. Burks for another follow-up visit on March 4, 2015 (A.R. 753). Ms. Blagg reported that she was "still having fairly significant pain." (*Id.*). On physical examination of her musculoskeletal system, Dr. Burks documented significant pain with medial and lateral compression of the right calcaneus, antalgic gait, and diffuse edema (*Id.*). Dr. Burks recommended physical therapy and noted the "possibility that she may not be able to return to work." (*Id.*). On March 17, 2015, Dr. Burks completed a Physical Capacities Evaluation Form in which he indicated that Ms. Blagg could stand or walk for 30 minutes in an 8-hour workday (A.R. 879–80).

On March 20, 2015, Ms. Blagg returned to Dr. Johnson to follow up on her back problems (A.R. 800–04). Ms. Blagg's review of systems and physical examination were normal, and she was assessed with essential hypertension, actinic keratosis, and bursitis (A.R. 801–03). Dr. Johnson indicated that Ms. Blagg was able to sit, walk, or stand for eight hours per day, that her manual dexterity ability to use hands and power tools was unchanged, and that she could lift without any problem, but that repeated heavy lifting might be a problem (A.R. 803–804).

After completing physical therapy, Ms. Blagg returned to Dr. Burks in May 2015, complaining of pain in her right foot (A.R. 920). An MRI scan of Ms. Blagg's right foot showed bone marrow edema, and Dr. Burks placed Ms. Blagg in a cast from June to November 2015 (*Id.*). Ms. Blagg reported having pain in her right hip and leg while in the cast, as well as pain going into

her right big toe (*Id.*).  An MRI scan of Ms. Blagg's right hip, dated June 2, 2015, showed mild bilateral hip osteoarthritis and mild right greater trochanteric bursitis (A.R. 223–24).

On June 23, 2015, Ms. Blagg had a nerve conduction study, which revealed a right L5 radiculopathy (A.R. 213–14).  That same day, Dr. Thomas completed a status report indicating that Ms. Blagg's only restriction or limitation was that she could not lift more than 30 pounds, but that this was temporary and would last for the next 3 to 6 months (A.R. 881–82).  One month later, however, Dr. Thomas opined that, as a result of her significant back and leg pain and severe headaches from occipital neuralgia, Ms. Blagg "should be considered for complete and total, long-term disability."  (A.R. 889).  In August 2015, Dr. Thomas suggested that Ms. Blagg could return to work with a 30-pound lifting restriction (A.R. 958).

An MRI of Ms. Blagg's cervical spine, dated August 26, 2015, showed multilevel disc desiccation, posterior disc osteophyte complexes from C4-5 to C6-7 levels with moderate bilateral neural foraminal narrowing at C6-7, and multilevel facet degenerative changes and uncovertebral osteophytes (A.R. 221).

Ms. Blagg returned to Dr. Thomas on September 22, 2015, and complained of lower back pain that radiates into her right hip (A.R. 890).  Ms. Blagg's physical examination was normal (*Id.*).  Dr. Thomas noted that a lumbar myelogram showed mild degenerative changes at L4-5, but without nerve compression, which he described as "[n]othing that I would recommend surgery for."  (*Id.*).  Ms. Blagg returned to Dr. Thomas on October 20, 2015 (A.R. 891).  Dr. Thomas observed that Ms. Blagg had considerable back pain at the L5-S1 nerve root (*Id.*).  Ms. Blagg's review of systems and physical examination were normal (A.R. 892–93).  On Dr. Thomas' recommendation, Ms. Blagg had a right, L5 selective nerve root block and returned to Dr. Thomas on October 30, 2015 (A.R. 890, 896).  Ms. Blagg reported that "it helped significantly with her

right leg pain," but that she "continues to have low back pain that is worse when she rises from a sitting position to a standing position." (A.R. 896). Ms. Blagg's physical examination was normal (*Id.*). X-rays showed a bone spur and degenerative changes at L5-S1, which Dr. Thomas classified as "mild to moderate." (*Id.*).

On March 2, 2016, a Functional Capacity Evaluation ("FCE") was conducted by Stuart Jones, a physical therapist (A.R. 900–17). According to Ms. Jones' assessment of Ms. Blagg's physical tolerance to work tasks, Ms. Blagg could frequently (34–66%) sit or walk, occasionally (1–33%) stand, climb, squat, forward bend, right forward reach, left forward reach, right overhead reach, right grasp, or left grasp, and never kneel, twist, or left overhead reach (A.R. 900). With respect to material handling, Ms. Jones found that Ms. Blagg could not lift more than five pounds (*Id.*). At the same time, Ms. Jones stated that "[t]he results of this evaluation indicate that an unreliable effort was put forth, with only 26 of 55 statistical consistency measures within expected limits." (A.R. 901). Ms. Jones concluded that Ms. Blagg's "current functional status remains unknown at this time due to her failure to produce sufficient objective data to substantiate her reported and/or demonstrated limitations." (A.R. 902).

Ms. Blagg returned to Dr. Thomas for a follow-up visit on March 11, 2016, and complained of increased pain in her neck and right leg, as well as decreased range of motion in her right shoulder (A.R. 918). X-rays of Ms. Blagg's cervical spine showed no dislocations or fractures, and an MRI scan of her cervical spine was negative for any surgery (*Id.*).

On April 5, 2016, an Independent Medical Evaluation ("IME") was conducted by Thomas P. Rooney, M.D (A.R. 919–25). On physical examination, Dr. Rooney noted that Ms. Blagg:

> is very cooperative, but very depressed and cried during the last part of the interview. She walks with a slight antalgic gait on the right side, but her balance appears to be good. She can heel/toe stand with difficulty. She is unable to squat down. On standing erect, she has normal curvatures in the cervical, thoracic and

lumbar spines.  In the cervical spine, she rotates 50 degrees in either direction. Extension is 40 degrees, flexion is full.  There is no spasm.  She does have tenderness in the right paravertebral muscles and trapezius, and both shoulders. There is full motion in both shoulders, but pain with anything above 90 degrees. There is no definite weakness in the upper extremities, except that her grip strength is 2-kilograms on either side.  If she combines the hands, she can grip to 3-kilograms.

In the thoracic spine, chest expansion is about 1-inch.  There is no tenderness or spasm.  In the lumbar spine, the iliac crests are level.  She complains of pain in the lumbosacral area on the right side with attempted motion.  Flexion in the lumbar spine occurs to about 30 degrees and she incompletely reverses the lordotic curvatures and complains of pain.  Lateral bending and extension are about 20 degrees and all painful.  There is generalized tenderness throughout the lumbar spine, but no spasm and the iliac crests are level.

Deep tendon reflexes in the upper and lower extremities are normal.  There are no pathological reflexes.  She has full motion in hips, knees and ankles.  She has full motion in both feet, but unless she is standing on her toes she has difficulty dorsiflexing the toes on the right side.  There are no sensory changes.  She has mild tenderness about her heel on the right side.  It is not well-localized.  There are good pedal pulses present.  There are no pathological reflexes.  In the sitting position, straight leg raising on either side produces severe low back and leg pain, aggravated by popliteal compression and plantarflexion of either ankle.  She has similar strongly positive straight leg raising supine, which again is made worse by hip flexion and plantarflexion of the feet.  She has full painless motion in both hips.

(A.R. 920–21).  Based on his physical examination and a review of Ms. Blagg's medical records,

Dr. Rooney determined that "[a]ll of her findings are degenerative in nature and not related to her

work activities" and, therefore, found "no reason why she cannot continue with her normal job

responsibilities."  (A.R. 923).

In an addendum to his IME, dated June 8, 2016, Dr. Rooney diagnosed Ms. Blagg with

multilevel cervical and lumbar degenerative disc disease (A.R. 924).  Dr. Rooney explained that

Ms. Blagg had "mild to moderate impairment because of the degenerative spinal problems, which

would interfere with her ability to do repeated lifting and bending, and repeated rotational

movements in the cervical spine."  (A.R. 925).  However, Dr. Rooney believed that Ms. Blagg's

"observable subjective complaints do not correlate with her objective findings," and that the

behaviors exhibited by Ms. Blagg "are not consistent with the records and complaints." (A.R. 924, 925). Dr. Rooney concluded that Ms. Blagg could sit for up to six hours in an eight-hour day, provided that she sits for no more than two hours at a time without taking a break, that she can stand for up to six hours in an eight-hour day, and that there was no limit to the amount of walking that she could do (A.R. 925). Dr. Rooney further concluded that Ms. Blagg "has no restrictions of limitations of the upper extremities, overreaching, pulling, and lifting," and that "[t]here are no restrictions on her use of the lower extremities," except that "[s]he will have limitations on repetitive movements, such as bending, stooping, crawling and climbing due to the degenerative changes in her spine." (*Id.*).

A Transferable Skills Analysis ("TSA"), dated August 2, 2016, identified eight occupations for which Ms. Blagg possessed the transferable skills to perform: (1) assembler, small products I, (2) receptionist, (3) telephone operator, (4) security guard, (5) information clerk, (6) order clerk, (7) telephone solicitor, (8) cashier II (A.R. 984). A Labor Market Survey ("LMS"), also dated August 2, 2016, identified two available positions in Ms. Blagg's geographic area that Eaton believed would accommodate her physical limitations, as outlined in Dr. Rooney's IME (A.R. 979–80).

Ms. Blagg returned to Dr. Johnson for a follow-up exam on October 17, 2016 (A.R. 926–30). She presented with multiple problems, including hypertension, low back syndrome, and irritable bowel (A.R. 926). Dr. Johnson assessed Ms. Blagg with chronic antral gastritis, irritable bowel syndrome without diarrhea, and lumbosacral disc degeneration (A.R. 929). Dr. Johnson also noted that Dr. Thomas had referred Ms. Blagg to Ken Rosenzweig, M.D., who administered two sacroiliac joint injections (*Id.*). In a statement dated December 16, 2016, Dr. Rosenzweig opined that Ms. Blagg could lift no more than 10 pounds on an occasional basis, could stand, walk,

or sit for less than 2 hours in an 8-hour day, and could never stoop (*i.e.*, bend), crouch, or climb ladders (A.R. 187–88).   Dr. Rosenzweig further opined that Ms. Blagg's reaching, including overhead, and pushing and pulling were affected by her impairments, and that her impairments or treatment would cause her to be absent from work more than three times a month (A.R. 188–89).

Sedgwick referred Ms. Blagg's claim file to Carol Hulett, M.D., a board-certified orthopedic surgeon, and John Schneider, Jr., M.D., a board-certified neurological surgeon (A.R. 947–961).   Dr. Hulett reviewed Ms. Blagg's medical history and noted that she had been diagnosed with multilevel degenerative disc disease of the cervical and lumbar spine (A.R. 958).   Dr. Hulett elaborated that Ms. Blagg's most significant medical problem, from a work perspective, was her right sacroiliac joint arthritis and dysfunction (A.R. 958).   Dr. Hulett determined that Ms. Blagg should not repeatedly lift, bend, squat, twist, or lift, that she could occasionally lift up to 25 pounds, that she could six for 6 hours in an 8-hour day, provided that she sits for no more than 2 hours at a time, and that she could stand for 6 hours in an 8-hour day, provided that she changes position every 2 to 3 hours (*Id.*).   Dr. Hulett acknowledged that Dr. Rosenzweig "suggested more expansive and restrictive limitations," but found that such restrictions were not supported by Ms. Blagg's clinical exams or Ms. Jones' FCE (*Id.*).   Finally, Dr. Hulett indicated that, although Ms. Blagg's restrictions and limitations were likely permanent, as no surgery had been planned, she "would be expected to work within these restrictions and limitations."  (A.R. 959).

For his part, Dr. Schneider opined that Ms. Blagg "has degenerative lumbar and degenerative conditions that are mild in nature and not causing severe neurological compromise," and that she "has the capacity to work without restrictions during the entire timeframe under review."  (A.R. 951).

Ms. Blagg returned to Dr. Rosenzweig on August 22, 2017, at which time she noted that, although physical therapy had "helped her," she still had complaints of pain, which she rated a "5" on a scale from 1 to 10, as well as difficulty stooping, bending, and lifting (A.R. 640).  On physical examination, Dr. Rosenzweig made the following observation:

> She complains of pain with root tension findings on the left.  There is a positive Lasègue's maneuver and a positive flip.  She has positive straight-leg-raising and Lasègue's maneuver on the right but does not flip. . . .  She is complaining of her foot rolling out.  She has an element of radicular findings today which she has not had in the past.

(A.R. 640).

The Committee referred Ms. Blagg's claim file to Simon Anthony Salerno, M.D., a board-certified neurological surgeon, and William Tontz, Jr., M.D.,  a board-certified orthopedic surgeon (A.R. 1033–43).  In a report dated January 2, 2018, Dr. Salerno summarized Ms. Blagg's medical records and concluded that "[t]here is no objective evidence that claimant is unable to perform a job," as imaging revealed only mild degenerative findings (A.R. 1036).  Similarly, Dr. Tontz, in a report also dated January 2, 2018, discussed Ms. Blagg's medical records and determined that "[t]here is no part of the medical evidence that objectively documents that the patient is unable to perform the job."  (A.R. 1042).  Although Dr. Tontz acknowledged that Ms. Blagg "has chronic subjective pain," he believed that there was "no clear evidence of functional limitations to support medically appropriate restrictions."  (*Id.*).

## II.    Standard Of Review

The Supreme Court has ruled that a denial of benefits challenged under ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  "An administrator's decision is

reviewed for an abuse of discretion where the plan in question gives the administrator 'discretionary authority to determine eligibility for benefits.'" *Anderson v. U.S. Bancorp*, 484 F.3d 1027, 1031 (8th Cir. 2007) (quoting *Bruch*, 489 U.S. at 115).  The Eighth Circuit has explained that this deferential standard is not applicable, however, if the claimant "presents 'material, probative evidence demonstrating that' there exists 'a palpable conflict of interest' or 'a serious procedural irregularity' that caused a 'serious breach' of the administrator's fiduciary duty to the claimant." *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 973 (8th Cir. 2003) (quoting *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998)).

It is well-established that, under the abuse-of-discretion standard, the plan administrator's decision will be reversed only if it was "arbitrary and capricious."  *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 896 (8th Cir. 2009) (quoting *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2006)).  To determine whether a plan administrator's decision was arbitrary and capricious, a court asks whether the decision to deny benefits "was reasonable" and "supported by substantial evidence."  *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir. 2006) (quoting *King v. Hartford Life & Acc. Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005)).  Substantial evidence is "more than a scintilla but less than a preponderance."  *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000).  Five factors are considered:

> (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005) (quoting *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002)).

"If substantial evidence supports the decision, it should not be disturbed even if a different, reasonable interpretation could have been made." *Johnson v. United of Omaha Life Ins. Co.*, 775 F.3d 983, 989 (8th Cir. 2014) (quoting *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004)).  Stated differently, a court "must affirm if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Rutledge v. Liberty Life Assur. Co. of Bos.*, 481 F.3d 655, 659 (8th Cir. 2007) (quoting *Groves*, 438 F.3d at 875 (8th Cir. 2006)).

## III.     Analysis

Because the Plan contains a discretionary clause, the Court will review for an abuse of discretion Eaton's termination of Ms. Blagg's long-term disability benefits.  For the following reasons, the Court finds that Eaton did not abuse its discretion in terminating Ms. Blagg's long-term disability benefits.  Therefore, the Court will not disturb Eaton's decision.

### A.     The Abuse-Of-Discretion Standard Is Appropriate

Ms. Blagg maintains that the abuse-of-discretion standard is not applicable here, stating that,  "if the Plan contains a discretionary clause," she "cannot find it."  (Dkt. No. 16, at 6). However, the Court has carefully reviewed the Plan and finds that it contains a discretionary clause, which provides as follows:

> Benefits under the Eaton Plans will be paid only if the Plan Administrator and/or the appointed Claims Administrator decides that the applicant is entitled to them under the terms of the Plan.  The Plan Administrator and/or the Claims Administrator has discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including but not limited to any disputed or doubtful terms.  The Plan Administrator and/or Claims Administrator also has the power and discretion to determine all questions arising in connection with the administration, interpretation and application of the Plan.

(A.R. 170).

14

Next, Ms. Blagg argues that Arkansas Department of Insurance Rule 101, codified at Arkansas Administrative Code § 054.00.101, bars the enforcement of discretionary clauses in insurance contracts.  "On December 19, 2012, the Arkansas Department of Insurance adopted Rule 101, which prohibits the use of discretionary clauses in disability income policies."  *Davis v. Unum Life Ins. Co. of Am.*, No. 4:14-CV-00640-KGB, 2016 WL 1118258, at *3 (E.D. Ark. Mar. 22, 2016).  Rule 101 provides, as relevant here, that:

> No policy, contract, certificate or agreement offered or issued in this State providing for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the laws of this State.

Ark. Admin. Code § 054.00.101-4.  Rule 101 applies to "all disability income policies issued in [Arkansas] which are issued or renewed on and after March 1, 2013."  Ark. Admin. Code § 054.00.101-7.

Here, the Plan was issued in Ohio and contains a choice-of-law provision specifying that Ohio, not Arkansas, law applies to the extent that federal law does not (A.R. 1076).  Notably, neither party has presented any evidence that Ohio prohibits discretionary clauses in insurance contracts.  Ms. Blagg, while conceding that the Plan contains such a choice-of-law provision, contends that the Summary Plan Description for Eaton Employees ("SPD") does not contain a choice-of-law clause and that, as the more recent of the plan documents, the SPD "trumps" the Plan itself.  (Dkt. No. 16, at 9 (citation omitted)).  The Court disagrees.  The SPD, by its own terms, is only a summary of the Plan's "main features," and "[t]he entire Plan and applicable group policies, not only [the] SPD," are "determinative in all matters pertaining to rights and obligations with respect to each Plan."  (A.R. 3).

15

Alternatively, Ms. Blagg argues that "thrawting the intent of the Arkansas Insurance Commissioner by applying Ohio law . . . would be fundamentally unfair and unreasonable, and the Court should not allow such an argument to prevail." (Dkt. No. 16, at 9 (citation omitted)). "Where a choice of law is made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair." *Brake v. Hutchinson Tech. Inc. Grp. Disability Income Ins. Plan*, 774 F.3d 1193, 1197 (8th Cir. 2014) (citation and internal quotation marks omitted). Despite Ms. Blagg's contention to the contrary, the Court finds nothing unreasonable or fundamentally unfair about enforcing the Plan's Ohio choice-of-law provision. *See Kochanek v. Aetna Life Ins. Co.*, No. 4:16-CV-00324 BSM, 2018 WL 4088762, at *3 (E.D. Ark. Aug. 27, 2018) (declining to apply Rule 101 when the policy at issue adopted a Georgia choice-of-law provision); *Ganter v. Sun Life Assurance Co. of Can.*, No. 1:14-CV-1064, 2016 WL 11587419, at *2 (W.D. Ark. Mar. 15, 2016) (declining to apply Rule 101 when the policy at issue adopted a Tennessee choice-of-law provision); *see also Brake*, 774 F.3d at 1197 (declining to apply a South Dakota regulation barring discretionary clauses when the policy at issue adopted a Minnesota choice-of-law provision); *Foorman v. Liberty Life Assur. Co. of Bos.*, No. 1:12-CV-927, 2013 WL 1874738, at *3 (W.D. Mich. May 3, 2013) (declining to apply Michigan's ban on discretionary clauses to an ERISA plan with a Tennessee choice-of-law provision).

Ms. Blagg's reliance on Arkansas Code Annotated § 23-79-109(a)(3), made applicable to mutual assessment life and disability insurers by Arkansas Code Annotated § 23-72-103(9), is unavailing. That section provides, in pertinent part, that:

> No group accident and health certificate of insurance may be extended to residents of this state under a group accident and health policy issued outside this state that does not include the provisions required for group policies issued in this state unless the commissioner determines that the provisions are not appropriate for the coverage provided.

Ark. Code Ann. § 23-79-109(a)(3). Because, as noted above, the Plan plainly states that Ohio, not Arkansas, law applies to the extent that federal law does not, § 23-79-109(a)(3) and Rule 101 are not applicable to the Plan. *See Ganter*, 2016 WL 11587419, at *2.[2]

Finally, Ms. Blagg claims that Eaton is not entitled to deference because it both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. Again, the Court disagrees. To be sure, this dual role creates a conflict of interest, and Eaton concedes as much. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 112–15 (2008). However, the Supreme Court has explained that "a reviewing court should consider that conflict as a *factor* in determining whether the plan administrator has abused its discretion in denying benefits," and that "the significance of the factor will depend upon the circumstances of the particular case." *Id.* at 128 (emphasis added). Ms. Blagg's conclusory allegations notwithstanding, the record contains no evidence of biased claims administration. Thus, the abuse-of-discretion standard is appropriate, and the Court will consider the conflict of interest as one of many factors in the analysis.

### B.    Substantial Evidence Supports Eaton's Decision

Ms. Blagg argues that her "spine conditions preclude her from performing any type of employment as per the applicable Plan definition of disability." (Dkt. No. 16, at 11). Ms. Blagg claims that, in reaching a contrary conclusion, Eaton "simply ignored" the opinion of one of her treating physicians—specifically, Dr. Rosenzweig—as well as an electromyography ("EMG") and nerve conduction study conducted on June 23, 2015 (*Id.*). Ms. Blagg also faults Eaton for relying on the opinions of two non-treating physicians: (1) Dr. Salerno, who allegedly relied on Dr.

---

[2] By Ms. Blagg's own admission, the Plan was issued on December 12, 2001, and became effective on January 1, 2002, preceding Rule 101's effective date of March 1, 2013. Still, Ms. Blagg contends that Eaton renewed or amended the Plan after March 1, 2013, specifically by issuing the SPD, effective January 1, 2016. Because the Court has already determined that Rule 101 does not apply to the Plan, the Court need not at this time address this argument.

Rooney's IME without mentioning Dr. Rosenzweig's opinion; and (2) Dr. Tontz, who, like Dr. Salerno, allegedly did not discuss Dr. Rosenzweig's opinion or the nerve conduction study.  Ms. Blagg notes the stark disparity between Dr. Rosenzweig's opinion that she could stand or walk for less than two hours in an eight-hour day and Dr. Rooney's opinion that she could sit for up to six hours and stand for eight hours in an eight-hour day (*Compare* A.R. 186, *with* A.R. 925).  Ms. Blagg further directs the Court's attention to an MRI scan of her lumbar spine, which demonstrates multilevel disc desiccation and mild facet degenerative changes, and of her cervical spine, which also demonstrates multilevel disc desiccation in addition to multilevel facet degenerative changes and uncovertebral osteophytes (A.R. 216, 221).  Finally, insisting that "[t]he administrative record in this case is full of objective findings," Ms. Blagg argues that each of the factors delineated above establish that Eaton abused its discretion in terminating her long-term disability benefits.  (Dkt. No. 16, at 13).

In its letter denying Ms. Blagg's second-level appeal, the Committee explained that, in making its decision, it reviewed and considered Ms. Blagg's entire claim file (A.R. 272).  Specifically, the Committee found that Dr. Rooney's IME, the August 2, 2016, TSA and LMS, and independent medical-records reviews by Drs. Salerno and Tontz supported its determination that Ms. Blagg is capable of working six hours per day, with certain limitations, and is, therefore, not disabled under the "any occupation" standard (A.R. 272–79).  The Committee informed Ms. Blagg that:

> Because (1) an independent medical examination concluded that Ms. Blagg is not restricted from performing the requirements of her job; (2) a transferable skills analysis concluded that Ms. Blagg would be capable of performing other jobs; (3) a labor market study concluded that qualifying jobs exist in Ms. Blagg's geographic region; and (4) two independent medical reviewers concluded that the medicals records contain no objective evidence that Ms. Blagg is disabled under the "any occupation" standard, the Committee has determined that in accordance with the "any occupation" disability definition as set forth under the 2016 LTD SPD your

client is not disabled under the terms of the LTD Plan for any time periods on or
after August 6, 2016.

(A.R. 279 (citation omitted)).

With respect to Ms. Blagg's accusation that Eaton improperly credited the IME conducted

by Dr. Rooney and the independent medical-records reviews by Drs. Salerno and Tontz over the

opinion of Dr. Rosenzweig, a treating physician, the Court notes that, "[w]hen there is a conflict

of opinion between a claimant's treating physicians and the plan administrator's reviewing

physicians, the plan administrator has discretion to deny benefits unless the record does not support

denial." *Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 814 (8th Cir. 2006).  As the Supreme Court

has explained:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's
> reliable evidence, including the opinions of a treating physician.  But . . . courts
> have no warrant to require administrators automatically to accord special weight to
> the opinions of a claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they credit reliable evidence
> that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  In short, "[w]here the record

reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding

the employee not to be disabled." *Delta Family-Care Disability & Survivorship Plan v. Marshall*,

258 F.3d 834, 843 (8th Cir. 2001).

The Court also notes that, contrary to Ms. Blagg's contention, Eaton considered, but

rejected, Dr. Rosenzweig's opinion and the nerve conduction study in upholding its termination of

Ms. Blagg's long-term disability benefits under the "any occupation" standard (A.R. 277).

Additionally, Eaton found that portions of Dr. Rosenzweig's treatment notes supported its decision

to terminate Ms. Blagg's long-term disability benefits.  For example, on October 31, 2016, Dr.

Rosenzweig noted that, although Ms. Blagg presented with chronic back, buttock, and leg pain,

she stated that she was "walking well" and "not having any feeling of her legs getting heavy."

(A.R. 227).  Ms. Blagg also reported 75% pain relief with sacroiliac joint and right trochanteric bursa injections (*Id.*).  On physical examination, Dr. Rosenzweig observed that Ms. Blagg did not appear to be in severe distress, her mobility was intact, and she did not have evidence of a foot drop on ambulation (*Id.*).   Further, and critically, on September 30, 2016, Dr. Rosenzweig documented that Ms. Blagg's "back, buttock, and lateral thigh pain is improved" and opined that "[h]er current symptoms do not reconcile with the L5 radiculopathy on the nerve testing."  (A.R. 229).  From this and other findings, Eaton determined that Dr. Rosenzweig's opinion that Ms. Blagg is not capable of performing sedentary work should not be credited because it was contradicted by his own treatment notes, as well as the IME conducted by Dr. Rooney and the independent medical-records reviews performed by Drs. Salerno and Tontz.

The Eighth Circuit has admonished district courts not to substitute their own weighing of the evidence for that of the plan administrator.  *See Farley v. Ark. Blue Cross & Blue Shield*, 147 F.3d 774, 777 (8th Cir. 1998).  So long as the decision "is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made." *Cash v. Wal-Mart Grp. Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997).  For the reasons explained above, Eaton's decision is not "overwhelmed by contrary evidence." *Coker v. Metro. Life. Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002) (quoting *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996)).  Eaton's reliance on the IME conducted by Dr. Rooney, independent medical-records reviews by Drs. Salerno and Tontz, and the FCE, the TSA, and the LMS was not arbitrary or capricious.  *Cf. Hare v. Hartford Life & Acc. Ins. Co., No. 4:09-CV-883-DPM*, 2010 WL 4269238, at \*3 (E.D. Ark. Oct. 27, 2010) (determining that the plan administrator did not abuse its discretion when it relied on independent medical-records reviews by two experienced doctors

and a vocational rehabilitation report in denying the plaintiff's claim for long-term disability benefits under an ERISA plan).

In sum, the Court finds that Eaton's termination of Ms. Blagg's long-term disability benefits was based on substantial evidence that Ms. Blagg is capable of working six hours per day, with certain limitations, and is, therefore, not disabled within the meaning of the Plan.  Therefore, Eaton's decision was not arbitrary or capricious, and the Court will not disturb it.

## IV.    Conclusion

For the foregoing reasons, the Court finds that Eaton did not abuse its discretion in terminating Ms. Blagg's long-term disability benefits.  Accordingly, the Court grants Eaton's motion for summary judgment (Dkt. No. 17) and denies Ms. Blagg's motion for judgment on the record (Dkt. No. 16).  The Court dismisses with prejudice Ms. Blagg's claim.

It is so ordered this 12th day of May, 2020.

_____
Kristine G. Baker
United States District Judge